# United States Court of Appeals
### For the Eighth Circuit

_____

No. 24-1427

_____

Devin Ledbetter

*Plaintiff - Appellant*

v.

B. Helmers

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: January 16, 2025
Filed: April 3, 2025

_____

Before LOKEN, SHEPHERD, and KELLY, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Devin Ledbetter was seriously injured by Brandon Helmers, a Springfield, Missouri police officer. Ledbetter sued Helmers under 42 U.S.C. § 1983, claiming that Helmers used excessive force in violation of the Fourth Amendment. After we affirmed the denial of qualified immunity at summary judgment, the case proceeded

to trial. With the jury unable to reach a verdict, the district court[1] granted Helmers's motion for judgment as a matter of law based on qualified immunity. Ledbetter appeals, arguing that our prior affirmance, the evidence at trial, and the clearly established law at the time of the events in question require reversal. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.

In the afternoon of December 16, 2020, Ledbetter and three others were drinking whiskey in a tent in Springfield, Missouri. The tent, which was part of a homeless community, was in a wooded area near an apartment complex and some local businesses. At some point, two of the occupants left to get water and firewood, leaving Ledbetter in the tent with a woman named Jamie.

That day, officer Helmers and his partner, Gilbert Correa, were on duty with the Springfield Police Department. Around 4:00 that afternoon, they were notified of a 911 call reporting that the caller's girlfriend was being held captive in a tent by a man armed with a knife. Helmers and Correa responded, meeting the caller at a nearby parking lot. After telling the officers that he believed his girlfriend was "in harm or being kidnapped or held against her will," the caller led Helmers and Correa to Ledbetter's tent. With dusk setting in, the caller identified the tent for the officers, who then directed the caller to stay back at a distance.

What happened next is disputed. According to the officers, Helmers approached the tent and identified himself as a police officer. A male voice from the tent responded, "Fuck you," followed by a female voice saying, "Don't hurt them." Ledbetter then ripped open the tent while holding a knife and stumbled out towards Helmers, who drew his firearm and retreated. Both Helmers and Correa—who had also drawn his firearm—began ordering Ledbetter to drop the

[1]The Honorable Roseann A. Ketchmark, United States District Judge for the Western District of Missouri.

knife. Ledbetter did not immediately comply, but eventually he dropped the knife after multiple warnings. Correa then turned his attention to the tent, while Helmers ordered Ledbetter to move away from the knife. Ledbetter did not move, so after two or three more commands, Helmers holstered his weapon and approached to escort Ledbetter away from the knife. Helmers grabbed Ledbetter's left wrist, but he felt Ledbetter tense up. Fearing that Ledbetter might become combative, Helmers grabbed Ledbetter's collar for a second point of contact and began ordering Ledbetter to get on the ground. When Ledbetter did not move, Helmers took a step backwards and pulled Ledbetter to the ground in front of him. Helmers then cuffed him and searched him for weapons. Not finding anything, Helmers sat Ledbetter up and asked if he had been injured. Ledbetter replied that he had fallen earlier in the day, but the injury felt worse, and he was in pain. So Helmers called an ambulance, which arrived and took Ledbetter to the hospital. From start to finish, the interaction lasted less than two minutes.

Ledbetter tells a far different story. While sitting in the tent with Jamie, Ledbetter heard voices approaching the tent. Assuming his campmate had returned with firewood, Ledbetter grabbed a knife with a serrated blade that he used for chopping wood and exited the tent. When he got out, he looked up and saw Correa, gun drawn and standing 15 to 20 feet away. Ledbetter immediately dropped the knife and put his hands in the air without prompting. When the officers ordered him to get on the ground, Ledbetter tried to comply. As Ledbetter was doing so, Helmers grabbed him, carried him several feet, flipped him upside down and body-slammed him onto a concrete slab like he was "spiking a football." Ledbetter began seeing black spots, and his leg had twisted around. The officers tried to pick him up, but Ledbetter yelled out that something was wrong. Helmers initially doubted the severity of Ledbetter's injuries, but Correa called an ambulance. On the ride to the hospital, Ledbetter was in such pain that the paramedics gave him multiple shots of Fentanyl. Ledbetter had never suffered a previous hip injury, and he complied with all of the officers' orders.

-3-

In contrast to the altercation, Ledbetter's injuries are not in dispute. Ledbetter sustained a fracture dislocation of his hip. The ball of his hip joint—part of his femur—came out of the socket and fractured, and his pelvis—the bone that makes up the socket—was broken into several pieces. At the hospital, doctors pulled Ledbetter's leg to place the ball back into the socket and surgically repaired the fractured pelvis with metal plates and screws. About a week after his surgery, Ledbetter was discharged from the hospital and given a walker to assist with his mobility. Several days later, he suffered a setback when he fell, causing his pelvis to break again. The fractures, which had yet to fully heal, had come apart. Doctors discovered that the ball of Ledbetter's hip joint was irreparably damaged and elected to remove it. As a result, Ledbetter will never have a functioning hip joint again, and he has been unable to walk ever since.

Ledbetter was eventually charged in state court with two counts of unlawful use of a weapon and one count of kidnapping. Pursuant to a plea agreement, Ledbetter pled guilty to one count of unlawful use of a weapon for "knowingly exhibit[ing], in the presence of . . . Helmers, a weapon readily capable of lethal use, in an angry or threatening manner," and he was sentenced to four years' imprisonment.

Ledbetter filed a pro se complaint, naming Helmers, Correa, and the Springfield Police Chief as defendants, though he later amended his complaint to name only Helmers and Correa.[2] As relevant here, Ledbetter alleged that the officers violated his rights under the Fourth and Fourteenth Amendments by using excessive force during his arrest. Both defendants asserted qualified immunity in their

---

[2]Though Ledbetter indicated that he was suing the defendants in both their individual and official capacities, his complaint sought monetary damages from the defendants, and it is clear that the district court construed his claim as raising only individual-capacity claims. See S.A.A. v. Geisler, 127 F.4th 1133, 1139-40 (8th Cir. 2025) (en banc) (directing courts to examine "course of proceedings" to determine whether a plaintiff is raising individual- or official-capacity claims). But see id. at 1140-42) (Shepherd, J., dissenting) (defending the "clear statement rule").

answers. Correa and Helmers then moved for summary judgment, arguing that there was no genuine issue of material fact and that both officers were entitled to qualified immunity.

Construing Ledbetter's claim as one under 42 U.S.C. § 1983, the district court granted the motion as to Correa but denied the motion as to Helmers. The court noted that there remained disputed issues of fact about the threat reasonably perceived by Helmers at the time he used the force. Moreover, even if Ledbetter posed a safety risk to officers or others, "there also remain[ed] a genuine issue as to the amount of force used and whether it was reasonable in relation to . . . Helmers'[s] need to use force." In addition, the court noted that disputes remained about the extent of Ledbetter's injuries and whether they were caused by Helmers in the first place. Finally, the district court noted that, when viewing the evidence in the light most favorable to Ledbetter, "a reasonable officer would have understood that the use of a body slam on a compliant arrestee was unlawful" at the time of Ledbetter's arrest, thus making qualified immunity inappropriate at that time. Helmers appealed, but this Court affirmed via summary order. See Ledbetter v. Helmers, No. 22-1135, 2022 WL 3910516 at *1 (8th Cir. Aug. 31, 2022).

The district court appointed counsel for Ledbetter, and the case proceeded to trial before a jury. In addition to testifying himself, Ledbetter called multiple witnesses, including a board-certified orthopedic surgeon to provide expert testimony about the nature and extent of Ledbetter's injuries. The expert testified that Ledbetter's injuries resulted from "a significant amount of force." According to the expert, Ledbetter's injuries were consistent with "high-energy trauma," analogous to those suffered after a fall from over eight feet, head-on collisions in car accidents, motorcycle wrecks, or a pedestrian getting struck by a car. The expert also noted that subsequent injuries like Ledbetter's occur frequently. After Ledbetter rested his case, Helmers called Correa as a witness before testifying himself, and both officers relayed a consistent version of the events. At the close of all the evidence, Helmers moved for judgment as a matter of law, arguing that no

-5-

reasonable jury could find for Ledbetter and that he was entitled to qualified immunity. The district court denied the motion.

The case was submitted to the jury, but they could not reach a verdict on liability. After receiving an Allen[3] instruction, the jury reaffirmed that they were deadlocked. The jury was, however, able to reach consensus on two special interrogatories: (1) whether Helmers reasonably believed that Ledbetter "posed an immediate threat to the safety of the officer(s) or others in light of the facts and circumstances," and (2) whether Helmers reasonably believed that Ledbetter was "resisting the defendant's effort to arrest [him] in light of the facts and circumstances." The jury unanimously answered "Yes" to the former, but "No" to the latter. In light of those answers, and the jury's insistence that they remained deadlocked on the general verdict, the district court discharged the jury.[4]

Based on those special interrogatories, Helmers then renewed his motion for judgment as a matter of law based on qualified immunity.[5] He argued that the special verdicts showed that Helmers's use of force was not excessive and that, even assuming it were, the fact that Helmers reasonably believed that Ledbetter posed a threat meant that qualified immunity was appropriate. In response, Ledbetter argued that the district court's prior rejection of qualified immunity, as embodied by this

---

[3]Allen v. United States, 164 U.S. 492, 501 (1896) (permitting courts to instruct deadlocked jurors to reconsider their entrenched positions).

[4]Though the district court did not state as much, it appears from the record that the district court meant to declare a mistrial based on the hung jury. See Fed. R. Civ. P. 48(c) (noting that a court "may order a new trial" if jury is unable to reach a unanimous verdict). At oral argument, counsel indicated that they operated under the belief that a mistrial had occurred, so we proceed in the same manner.

[5]The motion was labeled as a motion to dismiss. At oral argument, counsel indicated that such labeling was used only to distinguish the motion from a separate motion based on evidentiary sufficiency. In practice and effect, the motion is properly characterized as a renewed motion for judgment as a matter of law, and we treat it is such on appeal. See Fed. R. Civ. P. 50(b).

Court's summary affirmance, continued to govern, as there remained disputed facts about the relationship between the need for the force and the amount of force Helmers used, even in light of the special interrogatories. On that basis, he asked the court to grant him a new trial. The district court rejected Ledbetter's arguments. In its view, the evidence at trial and the jury's special interrogatories demonstrated that Helmers did not use excessive force in violation of the Fourth Amendment. Even assuming Helmers did use excessive force, the district court also held that Helmers's conduct did not violate clearly established law at the time of the incident, so he was entitled to qualified immunity. For those reasons, the district court granted Helmers's motion and denied Ledbetter's motion for a new trial as moot.

## II.

On appeal, Ledbetter argues that the district court erred in granting Helmers's post-trial motion for judgment as a matter of law based on qualified immunity. Government officials are entitled to qualified immunity "if their actions do not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Wilson v. Lamp, 901 F.3d 981, 986 (8th Cir. 2018) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To defeat this immunity, a plaintiff must show that (1) his constitutional rights were violated, and (2) those rights were clearly established at the time of the deprivation. Id. A failure of proof at either step is dispositive. See Howard v. Kan. City Police Dep't, 570 F.3d 984, 987-88 (8th Cir. 2009); see also Pearson v. Callahan, 555 U.S. 223, 236 (2009) (recognizing the court's discretion in deciding "which of the two prongs of the qualified immunity analysis should be addressed first"). "We review the district court's determination of qualified immunity de novo." Richmond v. City of Brooklyn Center, 490 F.3d 1002, 1006 (8th Cir. 2007).

Qualified immunity is normally "an immunity from suit rather than a mere defense to liability." Watson v. Boyd, 2 F.4th 1106, 1110 (8th Cir. 2021) (quoting Pearson, 555 U.S. at 231). In the usual case, this means the qualified immunity analysis is applied—and decided—before the case proceeds to a trial on the merits.

See, e.g., <u>Wilson</u>, 901 F.3d at 986.  Simply put, this is not the usual case.  See <u>Hill v. McKinley</u>, 311 F.3d 899, 902 (8th Cir. 2002).  We are faced with a post-trial grant of qualified immunity after the denial of qualified immunity at the summary judgment stage, and after a jury was unable to reach a general verdict but was able to return factual findings on a special verdict form.  In conducting our review, then, we must view the facts in the light most favorable to the nonmoving party, "rely[ing] on the jury's factual findings on the special verdict form in making our qualified immunity ruling."  See <u>Richmond</u>, 490 F.3d at 1006; <u>see also</u> Fed. R. Civ. P. 50.

The questions for us are whether, applying that standard, (1) a reasonable jury could find the Helmers used excessive force in violation of Ledbetter's Fourth Amendment rights, and (2) at the time of the incident, a reasonable officer in Helmers' position would have understood he was violating that right.  See <u>Richmond</u>, 490 F.3d at 1007.  The district court held that Ledbetter's claim failed under both prongs.  Ledbetter challenges both holdings, and we address his challenges in turn.[6]

A.

The Fourth Amendment prohibits the use of excessive force—force that is "objectively unreasonable."  <u>Sanders v. Newton</u>, 117 F.4th 1059, 1066-68 (8th Cir. 2024) (citation omitted), <u>abrogated on other grounds by</u> <u>Geisler</u>, 127 F.4th at 1138.  That reasonableness depends on "the facts and circumstances" of each individual case, "without regard to [an officer's] subjective intent or motivation."  <u>Id.</u> at 1067

---

[6]Though we could dispose of this case on the "clearly established" prong alone, <u>see</u> <u>Pearson</u>, 555 U.S. at 236 (overruling mandatory two-step framework from <u>Saucier v. Katz</u>, 533 U.S. 194 (2001)), it remains within our discretion to "to decide whether that procedure is worthwhile in particular cases."  <u>Id.</u> at 242.  We choose to exercise that discretion here due to the case's unique procedural posture and the fact that conducting the first step of the qualified immunity analysis clarifies our analysis of the second.  <u>See</u> <u>id.</u> (noting that "[i]t often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be" (citation omitted)).

(citation omitted). We look to "the totality of the circumstances" in making this inquiry, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396 (1989) (citation omitted). In particular, we examine "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Ryan v. Armstrong, 850 F.3d 419, 427 (8th Cir. 2017) (quoting Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015)).

Viewing the evidence in Ledbetter's favor and taking account of the jury's unanimous special interrogatories, a reasonable jury could conclude that Helmers used excessive force in violation of the Fourth Amendment. Helmers approached a compliant, non-resisting felon who posed little threat to officers or the public at that time. Ledbetter was in the process of complying with the officers' commands. Without warning, Helmers chose to body-slam him with the force of a motorcycle wreck, causing severe, long-lasting injuries. A reasonable jury could conclude that Ledbetter posed only a minimal threat; that the use of a body slam was unreasonably disproportionate to the need to contain whatever minimal safety threat Ledbetter posed at the time; that Ledbetter suffered catastrophic injuries because of that body slam; and that Ledbetter was entirely compliant with the officers' commands and was neither resisting arrest nor fleeing. Based on those circumstances, a reasonable jury could find that Helmers used excessive force.

Though Ledbetter asserts that the law-of-the-case doctrine compels this result, we note that our prior affirmance is not dispositive. Our decision then was based on the record as it stood when the district court denied Helmers's motion for summary judgment. We only decided whether that record, in the light most favorable to Ledbetter, established a violation of his clearly established rights. See Ledbetter, 2022 WL 3910516 at *1. The question before us now is different: whether the

evidence *presented at trial*, in the light most favorable to Ledbetter, established such a violation. The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Gander Mountain. Co. v. Cabela's, Inc., 540 F.3d 827, 830 (8th Cir. 2008) (citation omitted). Regardless of whether the record after trial is better for Ledbetter, it is necessarily different than that at summary judgment. The law-of-the-case doctrine does not prevent district courts from reaching a different conclusion in such a circumstance. See Peterson v. City of Plymouth, 60 F.3d 469, 473 (8th Cir. 1995).

If not in name, however, Ledbetter's argument shows the problem with the district court's analysis.[7] When denying Helmers's summary judgment motion, the district court noted that "[e]ven if . . . [Ledbetter] posed a safety risk to officers or others, there also remain[ed] a genuine issue as to the amount of force used and whether it was reasonable in relation to . . . Helmers'[s] need to use force." That statement remained just as true after the jury returned its special verdict form. Helmers testified that Ledbetter refused to comply with instructions to drop the knife and get on the ground, and that he grabbed Ledbetter's left arm with one hand and "pulled [Ledbetter] down in front of [Helmers] onto the ground" by his collar with the other. In contrast, Ledbetter describes a much more violent encounter. Ledbetter dropped the knife and put his hands up immediately. In response to Helmers's commands to get on the ground, Ledbetter began to comply. As he was doing so,

---

[7]The district court acknowledged that its determination of Helmers's reasonableness "could be viewed as a close call," but noted that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." R. Doc. 93 at 12. The truth of that proposition, however, does not speak to whether a violation occurred. Rather, it applies to the next step of the analysis—whether the law was clearly established. See Stanton v. Sims, 571 U.S. 3, 10-11 (2013) (per curiam) (declining to decide whether constitutional violation occurred, but holding that any such violation was not clearly established); Littrell v. Franklin, 388 F.3d 578, 582 (8th Cir. 2004) (noting that "clearly established" prong of qualified immunity protects officials from liability from "bad guesses in gray areas" (citation omitted)).

Helmers approached Ledbetter, "scooped [him] up," "carried [him] about 3 to 5 f[ee]t," "turned [him] upside down," and "body-slammed [him] on a chunk of concrete" like Helmers was "spiking a football." When coupled with the jury's specific factual finding that Helmers did not believe Ledbetter was resisting, these factual disputes make the district court's resolution of the issue improper.

In addressing "the relationship between the need for the use of force and the amount of force used," see Wilson, 901 F.3d at 989, the district court relied on the jury's finding that Helmers reasonably believed that Ledbetter posed a threat. It was proper for the district court to do so. See Littrell, 388 F.3d at 584-86 (noting that submission of special interrogatories can aid the district court's resolution of the qualified immunity issue). What the district court did not do, however, is complete the analysis: *the relationship between* that need and the *amount* of force used. See Wilson, 901 F.3d at 989. The mere fact that Ledbetter posed some threat did not give Helmers a license to use indiscriminate force. The question remains whether the force was reasonable under the circumstances, and that includes considering the degree of force used and its relationship with Helmers's need to use it. See also Kohorst v. Smith, 968 F.3d 871, 876 (8th Cir. 2020) (noting that "[t]he use of force is least justified against a nonviolent misdemeanant who does not flee or actively resist arrest and poses little threat to officers or the public").

Viewing the remaining disputed facts in Ledbetter's favor, as well as the factual underpinnings of the jury's special verdict, Helmers was faced with a compliant, non-resisting felon who posed minimal threat to officers or the public. Helmers chose to body-slam that individual with catastrophic force without warning. Under those circumstances, a reasonable jury could find that choice was unreasonable. Because a reasonable jury could find those circumstances to be true, the district court should not have resolved Helmers's qualified immunity motion on that ground.

-11-

B.

This conclusion does not end the inquiry. The district court held that, even assuming a reasonable juror could find that Helmers used excessive force, it was not clearly established that Helmers's use of force was excessive. As we have already noted, qualified immunity shields public officials from liability to the extent that their conduct does not violate "clearly established statutory or constitutional rights." See Kelsay v. Ernst, 933 F.3d 975, 979 (8th Cir. 2019) (en banc) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "A right is clearly established if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Johnson v. Carroll, 658 F.3d 819, 827 (8th Cir. 2011) (citation omitted).

Though the "very action in question" need not have been previously held unlawful, "the earlier cases must give officials fair warning that their alleged treatment of the plaintiff was unconstitutional." Id. at 827-28. "[T]he dispositive question is whether the violative nature of *particular* conduct is clearly established." Ehlers v. City of Rapid City, 846 F.3d 1002, 1012 (8th Cir. 2017) (quoting Mullenix v. Luna, 577 U.S. 7, 12 (2015)). This is particularly true in the Fourth Amendment context, as "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Id. (alteration in original) (citation omitted). Because we "look to the state of the law at the time of the incident" in conducting this inquiry, the question is whether it was clearly established on December 16, 2020, that body-slamming a threatening but non-resistant and compliant suspected violent felon was an excessive use of force. See Masters v. City of Independence, 998 F.3d 827, 837 (8th Cir. 2021) (citation omitted). Our review of the case law demonstrates that it was not.

Start with the law that was clearly established. By 2020, it was clearly established that the "use of force against a suspect who was not threatening and not resisting" is unreasonable. Wilson, 901 F.3d at 990. Similarly, we had recognized that "force is least justified against nonviolent misdemeanants who do not flee or

-12-

actively resist arrest." Brown v. City of Golden Valley, 574 F.3d 491, 499 (8th Cir. 2009). But the law was similarly clear that "[a] threat to an officer's safety c[ould] justify the use of force in cases involving [even] relatively minor crimes and suspects who are not actively resisting arrest or attempting to flee." Id. at 497. What was not clear was whether an officer faced with a potentially *violent felon* who presents *some threat* could use force to effectuate an arrest, even though the suspect was not resisting. Even less clear was the line delineating lawful force from that which would cross the Fourth Amendment line.

The most force Helmers used was a body-slam. While Ledbetter's evidence certainly suggests that force was significant, this is not a case involving deadly force. See Cole ex rel. Estate of Richards v. Hutchins, 959 F.3d 1127, 1134 (8th Cir. 2020) (noting that it is clearly established that the use of deadly force against suspect who "does not pose an immediate threat of serious physical harm to others" violates the Fourth Amendment). Thus, while the degree of force used is relevant to the analysis, see Ehlers, 846 F.3d at 1012 (noting that use of an armbar takedown against a resistant plaintiff was not a clearly established violation), the body of law that existed at the time of the incident did not extend to the use of a body-slam in the situation faced by Helmers here: a suspected violent felon who posed some threat to officers or the public. See Johnson, 658 F.3d at 828 (denying qualified immunity to officer who threw to the ground and maced a *nonviolent*, *non-threatening* suspected *misdemeanant*); Brown, 574 F.3d at 496-97, 501 (denying qualified immunity where suspected *misdemeanant* "posed at most a minimal safety threat" and "was not actively resisting arrest or attempting to flee"); Shannon v. Koehler, 616 F.3d 855, 862-63 (8th Cir. 2010) (holding that more than de minimis force was excessive against a suspect who was *not suspected of a serious crime*, was *not threatening*, and was not resisting arrest); Montoya v. City of Flandreau, 669 F.3d 867, 871-72 (8th Cir. 2012) (holding that force was not objectively reasonable where suspect was 10-15 feet from law enforcement and *did not pose a threat*).

Further, this case does not involve a "[g]ratuitous and completely unnecessary act[] of violence," see Henderson v. Munn, 439 F.3d 497, 503 (8th Cir. 2006)

-13-

(alterations in original), as the jury explicitly found that Helmers reasonably believed Ledbetter was a threat. That finding brings this case outside the body of clearly established law. See id. at 503-04 (denying qualified immunity where officer pepper sprayed arrestee who was lying face down with both arms handcuffed behind his back and no longer resisting arrest); Jackson v. Stair, 944 F.3d 704, 713 (8th Cir. 2019) (denying qualified immunity to officer who tased a "non-threatening, non-fleeing, non-resisting" suspected misdemeanant). To be sure, we take the facts underlying that finding in the light most favorable to Ledbetter. See Richmond, 490 F.3d at 1006. But even assuming he posed only a "minimal" threat, we have long recognized that "[a] threat to an officer's safety" can justify some measure of force, even "in cases involving relatively minor crimes and suspects who are not actively resisting arrest or attempting to flee." See Brown, 574 F.3d at 496-97.

The cases Ledbetter cites are not analogous enough to carry his burden. See Lewis v. City of St. Louis, 932 F.3d 646, 649 (8th Cir. 2019) (noting that plaintiffs bear the burden to show that law was clearly established). Some address the use of force against suspects who either presented no threat at all, see, e.g., McReynolds v. Schmidli, 4 F.4th 648, 653 (8th Cir. 2021), or were only suspected of non-violent misdemeanors, see, e.g., MacKintrush v. Pulaski Cnty. Sherriff's Dept., 987 F.3d 767, 771 (8th Cir 2021).[8] Others involve plaintiffs like Ledbetter, but address qualitatively different types of force. See, e.g., Munn, 439 F.3d at 503 (pepper spraying an assumed resistant, but handcuffed, felony suspect).

Though these cases share some overlap with the instant case, we require more. See Kelsay, 933 F.3d at 980 (holding that it was not clearly established that use of a takedown maneuver against a non-compliant arrestee was unlawful despite decisions that such force was unlawful against compliant arrestees). The logic from Kelsay applies here: "Decisions concerning the use of force against suspects who were [not

---

[8]These cases were decided after the events in question here, but both cases document that the right of non-threatening, compliant misdemeanants to be free from body slams or similar techniques was clearly established well before Helmers body slammed Ledbetter.

threatening] are insufficient to constitute clearly established law that governs an officer's use of force against a suspect who [was threatening]."[9] See id. As we have already discussed, a reasonable jury could find that Helmers used excessive force. But the fact remains that liability in this case requires more than that. Qualified immunity "protects officials who make bad guesses in gray areas." Estate of Walker v. Wallace, 881 F.3d 1056, 1060 (8th Cir. 2018). At the time of the incident, Helmers was within that gray area.

Because Ledbetter cannot point to cases that would have put a reasonable officer on notice that Helmers crossed the Fourth Amendment line or a "robust consensus of persuasive authority constituting settled law" to that effect, see Graham v. Barnette, 5 F.4th 872, 887 (8th Cir. 2021), he has failed to prove that his rights were clearly established at the time of his encounter with Helmers, and the district court did not err in holding as much. Accordingly, the district court did not err in granting Helmers's post-trial motion for judgment as a matter of law based on qualified immunity.

III.

For the foregoing reasons, we affirm the judgment of the district court.

---

[9]For this reason, the cases cited by the dissent, see post, at 1, are similarly insufficient. See Samuelson v. City of New Ulm, 455 F.3d 871, 876-77 (8th Cir. 2006) (denying qualified immunity where officers "stepped on [arrestee's] head while handcuffing him" and "picked him up by his pinky fingers after being restrained"); Brown, 574 F.3d at 499 (denying qualified immunity where officers Tasered a nonviolent misdemeanant); Atkinson v. City of Mountain View, 709 F.3d 1201, 1212-13 (8th Cir. 2013) (denying qualified immunity where "the arrestee's 'alleged misconduct was neither violent nor serious'" and "[t]here [wa]s little evidence to indicate that [the arrestee] posed a physical threat to anyone." (alterations in original) (citation omitted)).

KELLY, Circuit Judge, dissenting.

I largely agree with the court's well-reasoned opinion, including its conclusion that a reasonable jury could find that Officer Helmers used excessive force. My only disagreement is that, as I see it, Ledbetter's right to be free from such force was clearly established. True, we do not have "a nearly identical case" to the facts here, but that is not required. Banks v. Hawkins, 999 F.3d 521, 528 (8th Cir. 2021) (noting that a plaintiff "does not have to point to a nearly identical case on the facts for the right to be clearly established [because] [o]ur precedent does not set such a prohibitively difficult standard"). I view our precedent at the time of the incident as sufficient, in combination, to have put Helmers on notice that the alleged use of force here was unlawful. See Samuelson v. City of New Ulm, 455 F.3d 871, 874, 876–77 (8th Cir. 2006) (denying qualified immunity where officers, who suspected plaintiff of burglary, hit and kicked him although "he was compliant with the officers' requests and did not resist arrest"); Brown v. City of Golden Valley, 574 F.3d 491, 499 (8th Cir. 2009) (recognizing that, at least as to nonviolent misdemeanants, "force is least justified against" those who, in addition to not fleeing or actively resisting arrest, "pose little or no threat to the security of the officers or the public"); Atkinson v. City of Mountain View, 709 F.3d 1201, 1213 (8th Cir. 2013) (explaining that "we [have] focused on evidence the arrestee was not resisting arrest" in finding an officer's use of force unconstitutional).

At the time of the incident, Helmers suspected Ledbetter of having committed a felony, and in turn, the jury found that Helmers reasonably believed Ledbetter posed a threat. But at this juncture, we must assume that that threat was minimal. See supra at 9 ("Helmers approached a compliant, non-resisting felon who posed little threat to officers or the public at that time."). Thus, viewing the facts in Ledbetter's favor, Helmers used significant force—body-slamming Ledbetter with the force of a motorcycle collision—despite Ledbetter being compliant, showing no resistance, and posing little threat. In my view, our case law would have "give[n] [Helmers] fair warning that [his] alleged treatment of the plaintiff was

unconstitutional." <u>Johnson v. Carroll</u>, 658 F.3d 819, 828 (8th Cir. 2011) (quoting <u>Meloy v. Bachmeier</u>, 302 F.3d 845, 848 (8th Cir. 2002)).

_____